COURT OF APPEALS
DECISION
DATED AND FILED

August 12, 2026

Samuel A. Christensen
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP829**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV403

IN COURT OF APPEALS
DISTRICT II

HALLMARK DEVELOPMENT CORPORATION,
VILLA MARIA LIMITED PARTNERSHIP,
VILLA MICHAEL, LLC AND DAVID R. BARNES,

    PLAINTIFFS-APPELLANTS,

  V.

BERKADIA COMMERCIAL MORTGAGE LLC
C/O CT CORPORATION SYSTEM AND AARON MOLL,

    DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Kenosha County: DAVID P. WILK, Judge. *Affirmed*.

Before Lazar, P.J., Gundrum, and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. David R. Barnes and his corporate entities, Hallmark Development Corporation; Villa Maria Limited Partnership; and Villa Michael, LLC (collectively "Barnes"), appeal the trial court's order entered against his misrepresentation claims and in favor of the respondents, Berkadia Commercial Mortgage LLC and Aaron Moll (collectively "Berkadia"). For the following reasons, we affirm.

## BACKGROUND

¶2     In 2018, Barnes was looking to refinance outstanding loans against three of his apartment complexes—Villa Maria, Villa Michael, and Villa Rosa— which had been fixed at 2.53% interest and were set to mature in September of that year. The existing loans were made directly to Barnes, who then lent the money to each of his three corporate entities, which held the properties, a structure his "accountant said that was the cleanest for … tax purposes[.]" Barnes drafted a refinancing proposal, which included a summary of his properties' financial conditions, and sent it to several different prospective lenders. He first contacted a person affiliated with his existing lender "about six, seven months before the loan was due, somewhere around there[.]" Barnes testified that the person told him, "You have a really good loan, you know, a very strong one … you should look at life insurance companies" and introduced Barnes to Moll, an employee of Berkadia, via email.

¶3     On February 21st, Barnes sent Moll a copy of his refinancing proposal because Moll "had indicated that he had potential lenders at rates that sounded very favorable." On February 23rd, Moll emailed stating, "[b]ased on my cursory review, I would expect very aggressive life co[-]pricing. We could potentially see pricing sub 3.75% at $8,000,000 on a 15/15[,]" which Barnes said

he understood to mean "very good pricing" on a 15-year fixed loan. Barnes went on to have "a variety of different calls with [Moll]." Moll knew that Barnes was pursuing other mortgage brokers during the same time.

¶4 During one conversation, Moll told Barnes that one insurance company was "offering loans at 85 basis points over the 10-year [United States] Treasury [UST] rate[.]"[1] Moll had also assured Barnes on March 2nd that his portfolio "underwrite[s] easily, and … I would expect considerable interest from life insurance correspondents." On March 9th, Moll emailed Barnes informing him that Lincoln Financial (Lincoln) had quoted his loan at "120 [basis-points] spread over the 10 yr[.] UST[,]" about which Barnes said he was "a little disappointed[.]" Barnes testified that Moll had stated over the telephone that the "one-man credit committee" in charge of credit review for Barnes's loan at Lincoln had "already seen [the proposal] and he like[d] it." However, Moll acknowledged he had not received any confirmation that that person had seen the deal up to that point in time.

¶5 Barnes testified that Moll informed Barnes that Lincoln would hold the interest rate for 90 days upon receipt of a completed application, and that an application would only be issued when "the loan was approved or until they were ready to give the loan." Barnes emailed Moll, "[h]ere's a thought. [Ten]-year UST is at about 2.7 with the 120 spread. That's 3.9[,]" which Barnes testified

---

[1] Barnes testified that in this loan transaction, the interest rate was expressed as a number of "basis points" above the 10-year United States Treasury rate. He explained that a single basis point is 1/100 of a percentage point. Thus, for example, a loan priced at 125-basis points would carry an interest rate 1.25 percentage points above the 10-year Treasury rate in effect when the loan was finalized.

meant he was negotiating for a 3.9 percent loan rate with Lincoln. Barnes wrote, "I'll accept 3.9 … if they hold that until September 1[st.]"

¶6      Around the same time, an employee of another mortgage broker Barnes was working with had emailed Barnes rate quotes for potential Fannie Mae and Freddie Mac loans, as well as quotes from another life insurance company. Barnes then sent an email to Moll inquiring about the status of negotiations with the lenders Moll was working with, in which he told Moll that he had gotten a proposal for 100 basis points (bps).

¶7      On March 16th, Moll informed Barnes of the proposed terms with Lincoln, stating, "[h]ere's the final quote. Rates pushed up a bit on us this week unfortunately. Lincoln is ready to go and issue an application. This deal has been fully screened and is ready to go." On March 17th, Barnes showed Moll the email from the other brokerage that detailed the Fannie Mae and Freddie Mac quotes he had received. Moll replied with an email regarding the Fannie Mae loan, saying, "I would caution that the 100 [bps] spread, in my opinion, … doesn't seem real" and concluding, "I think I've got a very clean and good deal ready to go with Lincoln." Barnes expressed frustration at the increase of the loan rate to 125 bps. Moll replied, "I may have over-promised a bit on a 90 bps spread early on" and assured Barnes that Lincoln's "full approval committee has now seen the deal and they are ready to sign it up." Barnes remained in contact with other brokers, receiving word from another proposing a 125 bps spread.

¶8      On March 23rd, Moll sent Barnes a Berkadia agency agreement, which stated in part:

> [s]ponsor grants Berkadia the right to obtain a permanent financing commitment ("Commitment") for a mortgage loan ("Loan") secured by the Property.

4

> Berkadia will utilize best efforts to obtain such Commitment pursuant to the following terms: Loan of $8,000,000 ("Loan Amount"); … 15-year amortization; 125 bps spread over the 10 YR UST.

Barnes emailed Moll his acceptance of the agency agreement, which Moll acknowledged. Moll gave Barnes instructions on filling out a loan application, noting, "[o]nce Lincoln accepts the fully completed application and is in receipt of the 1% ($80,000 wired funds) we can lock rate[.]" The $80,000 amount referred to a deposit that would be refunded to Barnes "[i]f the parties fail to enter into an executed commitment[.]" Barnes completed the application, submitted it, and sent the $80,000 deposit.

¶9 On March 26th, Moll emailed Barnes, stating that Lincoln had concerns about the well on one of his properties, as well as easements. After a back-and-forth exchange on the matter, Moll informed Barnes that Lincoln wanted to remove one of Barnes's three properties from the package due to the well issue, reducing the total amount of the loan. Moll informed Barnes that "we are rate locked with Lincoln at 4.03%[.]" Moll further said, "[a] due diligence checklist for final loan approval will be circulated shortly." Around the same time, Barnes had been pursuing a Fannie Mae loan through another brokerage, and he was notified that he would be sent a service agreement from that brokerage.

¶10 On April 11th, Barnes emailed Moll regarding "questions really insignificant to the quality or underwriting of the loan[,]" with which he was "rather frustrated" and told Moll, "[l]et's get this wrapped-up today." On April 12th, Moll told Barnes that Lincoln had removed another property from the loan proposal due to concerns about an easement. Moll relayed an oral offer by Lincoln of a $5,200,000 loan for the single property. Finally, on April 13th, Moll asked Barnes for wire instructions so he could return the $80,000 deposit to

5

Barnes. Communication diminished between Barnes and Moll sometime between April 13th and April 17th. Moll said that Barnes frequently attempted to call others at Berkadia around that time, saying, "[b]eing frantic is a polite way to put it."

¶11 Finally, Moll provided notice that Lincoln had formally denied Barnes's loan request, and that Lincoln had communicated with Berkadia that it was "no longer interested in financing [the remaining property]." Barnes contacted one of the other brokers he had worked with earlier, but was informed a prior Freddie Mac offer was no longer available. Barnes later closed a higher interest loan with a different broker.

¶12 Barnes filed suit against Berkadia and Moll, alleging a violation of WIS. STAT. § 100.18(1) (2023-24),[2] negligent misrepresentation, intentional misrepresentation, strict liability misrepresentation, breach of contract and breach of the covenant of good faith and fair dealing, and breach of fiduciary duties. The trial court entered factual findings that the parties had not cemented an interest rate deal by March 7th, and that Barnes counteroffered the March 9th proposal Moll had emailed Barnes, thereby rejecting the initial offer. It further found that Barnes took a "more aspirational than actual" offer from another broker and leveraged it against Moll, adding, "the evidence doesn't indicate that Barnes was seeking to rely on Moll's statements, but rather, was seeking to have Moll rely on his!" The court concluded that Barnes could not show detrimental reliance for any of his misrepresentation claims, and that his § 100.18 claim also failed because Barnes was not a member of the public for purposes of the statute, "the record does not

---

[2] All references to Wisconsin statutes are to the 2023-24 version.

support the conclusion that Moll's statements were untrue, deceptive or misleading," and Barnes failed to demonstrate pecuniary loss. As to Barnes's remaining claim of breach of contract and breach of the covenant of good faith, the court concluded that "the defendants met their duty." Barnes appeals the denial of each of his claims.

## STANDARD OF REVIEW

¶13 "[A] reviewing court may not substitute its discretion for that of the [trial] court." *State v. Rhodes*, 2011 WI 73, ¶26, 336 Wis. 2d 64, 799 N.W.2d 850. "It is for the trial court, not the appellate court, to resolve conflicts in the testimony. It is not within our province to reject an inference drawn by a fact finder when the inference drawn is reasonable." *Global Steel Prods. Corp. v. Ecklund*, 2002 WI App 91, ¶10, 253 Wis. 2d 588, 644 N.W.2d 269 (citation omitted). "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). This court sustains discretionary decisions if the trial court considered "the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson*, 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982). However, "[a trial] court's allocation of the burden of proof and its determination whether a party has met the burden of proof are questions of law we review de novo." *Wolfe v. Wolfe*, 2000 WI App 93, ¶14, 234 Wis. 2d 449, 610 N.W.2d 222.

## DISCUSSION

¶14 Barnes contends that the trial court erred in the following ways: (1) denying his breach of contract and breach of the covenant of good faith claim

by finding Berkadia and Moll met their duty to "utilize best efforts"; (2) denying his breach of fiduciary duty claim; (3) denying his misrepresentation claims; and (4) denying his WIS. STAT. § 100.18 claim by finding that he was not a member of the public for the purposes of the statute. We address each claim below.

## I. There was no breach of contract/breach of the covenant of good faith against Barnes.

¶15   "Parties to a contract have a duty of good faith to each other." *Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶35, 291 Wis. 2d 393, 717 N.W.2d 58. "[W]hen a contract requires that a party use its 'best efforts' to fulfill its contractual obligations, the notion of 'best efforts' incorporates the concept of good faith." *Id.* Our supreme court elaborated on the meaning of good faith in *Ekstrom v. State*, 45 Wis. 2d 218, 172 N.W.2d 660 (1969):

> [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counter-promise against arbitrary or unreasonable conduct on the part of the promisee.

*Id.* at 222 (citation omitted). "The existence or nonexistence of good faith as an issue is usually determined by the trier of fact." *Amoco Oil Co. v. Capitol Indem. Corp.*, 95 Wis. 2d 530, 542, 291 N.W.2d 883 (Ct. App. 1980).

¶16   Barnes contends that Moll and Berkadia breached the "best efforts" clause of the agency agreement to secure a loan for his three properties and "act[ed] against [his] interests [by] caus[ing] Lincoln to revoke the Villa Rosa loan offer." As the trial court found, the terms of the agreement required Berkadia to use its best efforts to secure a loan at the terms Barnes was initially seeking,

8

meaning a "[l]oan of $8,000,000 … 15-year amortization; 125 bps spread over the 10 YR UST." The court found that "Berkadia was the middleman." It found that "Moll continued his attempts to secure a deal for Barnes through Lincoln[.]" Berkadia did so by communicating questions Lincoln had to Barnes and assisting Barnes in filling out his application. Once Lincoln made clear that it would only be willing to refinance one of Barnes's three properties through a significantly smaller loan, it became impossible for Berkadia to secure a loan on the terms Barnes had initially sought. We conclude that the trial court did not err in finding that there was no breach of the covenant of good faith by Berkadia against Barnes: a "best efforts" clause is not a guarantee of success, and Berkadia did not violate the clause by failing to close a loan deal Lincoln was not interested in making.

¶17 Barnes contends that the trial court erred in finding that his loan fell through because of Lincoln's underwriting and due diligence requirements. However, Barnes fails to show this finding was clearly erroneous. He presents Berkadia's conduct during the period of time after Moll returned Barnes's deposit as evidence that Moll did not use best efforts, but this occurred after Lincoln had already decided it wanted to remove two of Barnes's properties from the loan, reducing the total amount. Berkadia's agreement was to use best efforts to secure a loan for specified terms, which would have been an $8,000,000 loan for his three properties. Because Lincoln had already rejected this possibility on April 12th, and Moll accordingly returned the deposit, any conduct after that point was not covered by the agreement. We conclude that the trial court did not err in its finding.

**II. There was no breach of any fiduciary duty to Barnes.**

¶18     In ***Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck***, 127 Wis. 2d 127, 377 N.W.2d 605 (1985), our supreme court described the scope of fiduciary duty as follows:

> [a] fiduciary relationship does not arise merely because a broker offers advice and counsel upon which a customer has a right to place trust and confidence. The right to place trust and confidence in the reliability of representations involving commercial transactions already is protected by the law of misrepresentation. A fiduciary relationship arises from a formal commitment to act for the benefit of another (for example, a trustee) or from special circumstances from which the law will assume an obligation to act for another's benefit. The mere fact of reliance on representations, therefore, does not necessarily create a relationship of trust and confidence leading to a fiduciary duty.

***Id.*** at 136 (citation omitted). That case concerned a nondiscretionary brokerage account in which the plaintiff retained ultimate responsibility for making investment decisions. The court "refuse[d] to hold that a broker is liable as a fiduciary for representations to an investor with a nondiscretionary account." ***Id.*** at 137.

¶19     Barnes contends that the trial court erred in denying Barnes's breach of fiduciary claim. He contends that Berkadia entered into a fiduciary relationship through the agency agreement, and that it breached its fiduciary duty by "failure to use 'best efforts' in securing a loan" and "acting against [Barnes's] interests to encourage and assist Lincoln in revoking its loan offer." The agreement was nonexclusive and only promised "best efforts" to secure a loan by specified terms, so the existence of or type of fiduciary relationship Barnes had with Moll is

10

unclear. Even so, the court found that Berkadia did fulfill its duty to use best efforts and that "[a]ny frustration of … purpose was due to Barnes's actions, not Berkadia['s] … alleged breach." There is no evidence Moll intentionally withheld crucial information from Barnes at any point in the application process after Barnes signed the agency agreement. We conclude that the trial court did not err in its finding: Barnes cannot demonstrate a specific breach of a fiduciary relationship, and therefore his claim fails.

### III. Barnes's common law misrepresentation claims fail as a matter of law.

¶20     All three types of common law misrepresentation claims require that "the plaintiff believed that the representation was true and relied on it." *Malzewski v. Rapkin*, 2006 WI App 183, ¶¶17, 19, 20, 296 Wis. 2d 98, 723 N.W.2d 156. Intentional misrepresentation and strict-liability misrepresentation each require that the plaintiff justifiably relied on the misrepresentation, and "[a] claim based on 'negligent misrepresentation inquires whether the buyer was negligent in relying upon the representation.'" *Id.*, ¶¶18-20 (citation omitted).

¶21     Barnes contends that three of Moll's statements to him were misrepresentations: (1) his March 9th statement that Lincoln's one-man credit committee had already seen Barnes's proposal and liked it; (2) his March 16th statement that Lincoln was ready to issue an application and that "[t]his deal has been fully screened and is ready to go"; and (3) his March 17th statement that "Lincoln's full approval committee has now seen the deal and they are ready to sign it up." We disagree because it is clear from the Record that Barnes did not actually rely on these statements. Barnes remained in negotiation with other lenders after all these dates, receiving interest rate quotes through other brokerages. Even if Barnes did rely on those statements, it is unclear that he relied

11

upon them to his detriment. The agency agreement he signed with Berkadia was a nonexclusive one, which Barnes admits, "[t]he non-exclusivity was a negotiated contractual term that was offered by Berkadia[.]" Accordingly, Barnes was not limited in his options to secure another loan.

¶22 As aptly stated by the trial court, "[d]etrimental reliance requires that the plaintiff, for example, spurned competing opportunities as a result of promises made by the alleged wrongdoer. Evidence supporting that conclusion is lacking[.]" Barnes presented no evidence that he spurned any of the offers from other brokers because of Moll's statements. He contends that because the broker with whom he pursued the Fannie Mae deal required him to sign an exclusive agency agreement to move forward, he was unable to pursue that deal while his nonexclusive agency agreement with Berkadia was in effect. This fails to establish reliance because, much like with Berkadia, an agency agreement would only have been the first step in many to secure a loan, so Barnes cannot demonstrate loss without more evidence that he would have obtained the Fannie Mae deal. Because detrimental reliance is necessary for all three of Barnes's misrepresentation claims, we conclude that all of them fail, regardless of the truth or falsity of Moll's statements.

**IV. Barnes's WIS. STAT. § 100.18 claim fails as a matter of law.**

¶23 A plaintiff must prove three elements to succeed on a WIS. STAT. § 100.18 claim. "First, that with the intent to induce an obligation, the defendant made a representation to 'the public.' Second, that the representation was untrue, deceptive or misleading. Third, that the representation caused the plaintiff a pecuniary loss." *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶19, 301 Wis. 2d 109, 732 N.W.2d 792 (citations omitted).

¶24    Barnes contends the trial court erred by finding that he was not a member of the public for the purposes of the first element, because, according to Barnes, "the subject misrepresentations all occurred prior to the [a]gency [a]greement being entered into between the [parties]." Berkadia contends that Barnes was not a member of the public because he "entered into detailed negotiations specific to [his] properties [and] moved beyond any 'public' relationship the statute protects." Under WIS. STAT. § 100.18, "a statement made to the particular party with whom one has contracted is not a statement made to 'the public.'" *Kailin v. Armstrong*, 2002 WI App 70, ¶43, 252 Wis. 2d 676, 643 N.W.2d 132. We conclude that Barnes is not a member of the public for purposes of § 100.18 because once Moll made an offer, Barnes counter-offered and strategized to achieve the deal he desired, resulting in his signing an agency agreement.

¶25    For his contention that under WIS. STAT. § 100.18 he was a member of the public because the alleged misrepresentations occurred before he signed the agency agreement, Barnes cites our decision in *Fricano v. Bank of America NA*, 2016 WI App 11, 366 Wis. 2d 748, 875 N.W.2d 143. Specifically, he cites the statement, "we fail to understand how the fact that parties are in negotiations over terms takes the potential purchaser out of the realm of 'the public.'" *Id.*, ¶30. While it is true that negotiating by itself does not necessarily establish a particular relationship, "[t]he existence of a particular relationship 'will depend upon its own peculiar facts and circumstances and must be tested by the statute in the light of such facts and circumstances.'" *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶27 (citation omitted). "[T]he substance of a representation made to induce an obligation, rather than the form of the initial contact, has more significance in determining whether a plaintiff is a member of 'the public[.]'" *Id.*, ¶25.

¶26    The trial court found that "the record does not support the conclusion that Moll's statements were untrue, deceptive or misleading[.]" Moll's statements about the loan approval process cannot be characterized as inducing Barnes to incur a pecuniary loss because Moll did not control whether the loan was approved. The court noted that "no deal meant no payday for Moll" as his compensation was "contingent upon the deal closing." Moreover, the deposit made by Barnes for the agency agreement was to be returned if the deal fell through. Barnes does not provide evidence that the court's factual determination that Barnes was not a member of the public was clearly erroneous. Accordingly, we conclude the trial court did not err by finding that Barnes was not a member of the public for the purposes of WIS. STAT. § 100.18.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.